IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-603-FL

| | |
|---|---|
| CAROLINA SUNROCK LLC, formerly known as Carolina Sunrock Corporation, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | ORDER |
| THE LANE CONSTRUCTION CORPORATION, individually and as successor-in-interest to Rea Construction Company, Inc., formerly known as Rea Contracting, LLC, ) ) ) ) ) ) ) | |
| Defendant. ) | |

This matter is before the court on plaintiff's motion to dismiss defendant's counterclaims. (DE 22). Defendant responded and plaintiff replied. In this posture, the issues raised are ripe for ruling. For the following reasons, plaintiff's motion is granted in part and denied in part.

**STATEMENT OF THE CASE**

Plaintiff commenced this action on November 18, 2015, asserting claims of breach of contract, waste, negligence, and violations of the North Carolina Oil Pollution and Hazardous Substances Control Act, arising out of conduct by defendant and defendant's alleged predecessor, Rea Construction Company, Inc., as tenants under a lease agreement with plaintiff. Plaintiff seeks damages, declaratory judgment, injunctive relief, costs, and fees. On January 4, 2016, defendant filed an answer and counterclaim based upon plaintiff's alleged breach of the same lease agreement, as well as a counterclaim for declaratory judgment.

The court's case management order sets a deadline for discovery by December 16, 2016, with dispositive motions due January 20, 2017. Plaintiff filed the instant motion to dismiss on February 17, 2016. Plaintiff moved to amend its complaint to join additional plaintiff parties on May 13, 2016, which motion is still ripening and will be addressed by separate order.

## STATEMENT OF FACTS

The facts alleged in the counterclaims, and drawn from documents referenced in the counterclaims, may be summarized as follows. Plaintiff is a Delaware corporation, with principal place of business in North Carolina. Defendant is a Connecticut corporation, with principal place of business in Connecticut. Plaintiff presently owns a parcel of land in Butner, North Carolina, hereinafter referenced as the "subject property".

In 1986, the subject property was owned by Continental Forest Investments, Inc., ("Continental") and leased to plaintiff. In that year, with permission of Continental, plaintiff sub-leased the subject property to Rea Construction Company, Inc. ("Rea Construction"), "for use as an asphalt plant." (DE 14-1 at 5) (hereinafter the "Rea Construction lease"). Rea Construction built a "hot-mix asphalt plant" on the subject property and operated said plant from 1986 to October 29, 2003. (DE 14 at 16). During this time, such operations resulted in release of "petroleum related compounds" onto the subject property and into the soil and groundwater of the subject property. (Id.).

Between 1986 and approximately 1989, the North Carolina Department of Transportation ("NCDOT") also operated an "asphalt testing laboratory" on the subject property. During this time, such NCDOT operations resulted in release of "chlorinated solvents" and "petroleum constituents" onto the subject property and into the soil and groundwater of the subject property. (DE 14 at 18).

At some point prior to 2003, plaintiff became the owner of the subject property. In September 2003, Rea Construction filed a Chapter 11 bankruptcy petition. In October 2003, following arms-length negotiations, defendant entered into an asset purchase agreement to purchase assets of Rea Construction and assumed the Rea Construction lease, subject to retention by Rea Construction of all environmental liabilities arising out of prior operations at the subject property.

Defendant continued to operate an asphalt plant at the subject property from October 29, 2003, to February 28, 2014. A separate entity established by defendant, Rea Contracting LLC, entered into a lease for the subject property on March 1, 2004, (hereinafter the "subject lease"), with plaintiff as landlord and Rea Contracting LLC as tenant. Rea Contracting LLC merged into defendant in November 2009, at which point defendant became tenant under the subject lease. Plaintiff notified defendant of termination of the subject lease, effective February 28, 2014.

The subject lease includes the following provisions for use of the subject property, as pertinent to the counterclaims:

> Section 5.01 Tenant may use and occupy the [subject property] for use as an asphalt plant, and for any uses or purpose which may be reasonably incidental thereto. . . .
>
> Section 7.01 Tenant shall fully comply with laws, rules, orders, ordinances, regulations and requirements of any Town, Country, State and Federal governmental authority claiming jurisdiction over the [subject property] and the Tenants [sic] use thereof. . . .
>
> Section 8.02 . . . . Offsite waste is prohibited from being brought to site for either temporary or permanent disposal with the exception of rap which is used for plant mixes. No wastes of any kind, including rap, will be buried on site. . . .
>
> Section 8.06 Tenant agrees . . . . to abide by all state and federal reporting standards for spills and to notify Landlord immediately of such an event and formally in writing within three (3) business days listing all details relevant (who was responsible, what was spilled, when did the spill occur; where did the spill occur, how much was spilled, what method was used for containment of disposal of the spill and where was the spill disposed). . . .

3

(DE 1-1). In accordance with these provisions of the subject lease, during the term of the subject lease, defendant buried no wastes of any kind, and no reportable spills occurred on the subject property.

The subject lease includes the following provisions concerning duties upon termination of the subject lease:

> Section 8.08 At termination, Tenant agrees to return the site to the same environmental condition as when Tenant took over and leased the land from Landlord. A recognized and qualified third party, acceptable to both parties, will be commissioned to inspect and certify the land — 1) is free of any and all environmental defects and hazards and — 2) meets the federal guidelines for a "clean site." The fee for the third party will be equally split by both the Tenant and the Landlord. If the land is unable to be certified free of environmental defects and hazards, Tenant agrees to rectify and return the site to its original "clean" environmental conditions at its expense.

(Id.). Upon termination of the lease, defendant returned the site to the same environmental condition as when defendant commenced the subject lease with plaintiff, in March 2004.

Plaintiff and defendant jointly commissioned a recognized and qualified third party, Falcon Engineering ("Falcon"), to conduct an environmental site assessment ("ESA") concerning the subject property. On October 31, 2013, in the second of two Falcon ESA reports (hereinafter the "Falcon ESAs"), Falcon concluded:

> Based upon the findings above and the results presented within this report, Falcon does not believe that the manufacturing activities carried out at this property by Lane have impacted the soils, in the areas sampled, that would require additional remedial actions. Additionally, it does not appear that the groundwater has been further impacted due to these activities. A responsible party for the contaminated groundwater has been established as NC DOT should further remedial action be required. Based upon the current property usage/classification as industrial and the apparent risk that would be assigned to this property, no further actions are recommended at this time.

(DE 22-3 at 22; see DE 22-2). On December 3, 2013, plaintiff demanded that defendant "remediate to pre-industrial activity levels any and all environmental defects and hazards, including those noted in the [ESA]." (DE 1-4; see DE 14 at 21). Plaintiff took the position that such remediation was required under the terms of the subject lease, and plaintiff requested "confirmation of completion of remediation activities," as well as an "independent third-party certification that the premises have insignificant levels of soil contamination [and] groundwater contamination." (Id.).

On October 29, 2014, and November 11, 2015, defendant entered the subject property, with plaintiff's permission, to remove soils mixed with asphalt, and defendant removed soil and asphalt from the subject property. Plaintiff has continued to demand that defendant provide a complete remediation of the subject property. In addition, on April 17, 2015, plaintiff "unilaterally terminated Falcon." (DE 14 at 22).

## DISCUSSION

A.  Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A pleading states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556.

5

In evaluating a claim, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the [claimant]," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). When a document is attached to a motion to dismiss, "a court may consider it in determining whether to dismiss the [claim] if it was integral to and explicitly relied on in the [pleading] and if the [claimants] do not challenge its authenticity." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004).

B. Analysis

1. Breach of Contract

Plaintiff argues that defendant's counterclaim for breach of contract fails as a matter of law because it is contradicted by the terms of the subject lease, as well as four documents plaintiff attaches to its motion to dismiss. The subject lease is explicitly referenced in the counterclaims. Two attached documents, the two Falcon ESAs, also are explicitly referenced in the counterclaims. Because these three documents are explicitly referenced in the pleadings, the court has considered these three documents in evaluating plaintiff's motion to dismiss. See id.

By contrast, one of the four documents attached to the motion to dismiss is a September 3, 2013, letter from Falcon to plaintiff, "Re: Scope of Services for Environmental Due Diligence – Lane Construction Butner Hot-Mix Asphalt Plant," which document is not referenced in the counterclaims. The fourth document attached to the motion is an April 17, 2015, letter from Mr.

6

Robert King, counsel for plaintiff, to Falcon. Because these documents are not explicitly relied on in the pleadings, the court does not consider them in evaluating the motion to dismiss. See id.

Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). "To constitute a valid contract, the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." Boyce v. McMahan, 285 N.C. 730, 734 (1974); see Horton v. Humble Oil & Refining Co., 255 N.C. 675, 679 (1961) ("[I]t is necessary that the minds of the parties meet upon a definite proposition. There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense.").

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 323 N.C. 623, 631 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94 (1949). Terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." Anderson v. Allstate Ins. Co., 266 N.C. 309, 312 (1966).

"Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976). "[W]hen the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court."

7

Hagler v. Hagler, 319 N.C. 287, 294 (1987). If language in a contractual provision in dispute is ambiguous, by contrast, "parol or extrinsic evidence may be introduced to show what was in the minds of the parties at the time of making the contract or executing the instrument, and to determine the object for or on which it was designed to operate." Root v. Allstate Ins. Co., 272 N.C. 580, 587 (1968).

In support of its breach of contract claim, defendant asserts that plaintiff has breached the subject lease by refusing "to abide by the conclusions contained in the Falcon ESAs, which were conducted in accord with the provisions of Section 8.08. . . , expressly for the purpose of determining whether [defendant] has returned the [subject property] in its original environmental condition that existed at the inception of the [subject lease]." (DE 14 at 22). This assertion fails as a matter of law because section 8.08 of the subject lease does not place upon plaintiff the duty that defendant asserts.

Section 8.08 imposes two duties upon plaintiff. First, it requires plaintiff to participate in commissioning a third party to inspect and certify the subject property. It provides: "A recognized and qualified third party, acceptable to both parties, will be commissioned to inspect and certify the land – 1) is free of any and all environmental defects and hazards and – 2) meets the federal guidelines for a 'clean site.'" (DE 1-1 at 5). Second, it requires that "[t]he fee for the third party will be equally split by both [defendant] and [plaintiff]." Id.

Section 8.08 places additional duties on defendant. It requires defendant to "return the site to the same environmental condition as when [defendant] took over" the subject lease. (Id.). In addition, it requires defendant "to rectify and return the site to its original 'clean' environmental

8

conditions at its expense," if the subject property "is unable to be certified free of environmental defects and hazards." (Id.).

Defendant's assertion that section 8.08 requires plaintiff to "abide by" the Falcon ESAs is flawed. As an initial matter, accepting defendant's own characterization of the Falcon ESAs, these reports provide a conclusion only as to whether defendant "has returned the [subject property] in its original environmental condition that existed at the inception of the [subject lease]." (DE 14 at 22). Defendant does not assert that they provide any conclusion as to whether the subject property "is free of any and all environmental defects and hazards" or "meets the federal guidelines for a 'clean site.'" (DE 1-1 at 5). The Falcon ESAs do not state this was their purpose. Indeed, they do not identify any "federal guidelines," and they do not state that the subject property is "free of any and all environmental defects and hazards." (cf. DE 1-1 at 5 with DE 22-3). Therefore, the Falcon ESAs do not appear to concern the subject matter specified for certification in section 8.08.

Defendant suggests, nonetheless, that Falcon's certification that defendant "has returned the [subject property] in its original environmental condition that existed at the inception of the [subject lease]" satisfies the requirement of certification as "free of environmental defects and hazards." (DE 14 at 22). This suggestion is a stretch of the plain language of the second sentence of section 8.08, which states that a third party will be commissioned to certify that the subject property is "free of any and all environmental defects and hazards." (DE 1-1 at 5). Defendant appears to take the position that the duty imposed upon it in the first sentence of section 8.08 informs upon the nature of the commissioning and certification referenced in the following sentences in section 8.08.

The court need not resolve definitively the nature and purpose of the Falcon ESAs, however, at this juncture in dismissing defendant's counterclaim. Whether the Falcon ESAs show that

9

<u>defendant</u> satisfied its duties under section 8.08 is a question the court reserves for consideration upon a more complete record. For purposes of the instant motion, even assuming that the Falcon ESAs constitute a certification that the subject property is "free of any and all environmental defects and hazards," section 8.08 does not place on plaintiff a duty to refrain from challenging that conclusion or demanding defendant to clean up the subject property. Plaintiff's obligations under section 8.08 are limited to commissioning a third party acceptable to it, and splitting the fee for such third party. (DE 1-1 at 5). In alleging breach of contract based upon plaintiff's refusal to "abide by" the Falcon ESAs, defendant seeks to incorporate restrictions and duties into the subject lease that are not present. While the parties conceivably could have executed a lease that restricted or bound plaintiff more specifically to the conclusions of any report commissioned, they did not do so. Accordingly, defendant's breach of contract counterclaim must be dismissed as a matter of law.

In so holding, the court reiterates that it expresses no opinion on the extent of duties imposed upon defendant, on whether plaintiff has stated a viable claim for breach of contract against defendant, or on the availability of defenses that defendant may raise to plaintiff's claims. It suffices that defendant has not stated a breach of contract counterclaim based upon plaintiff's asserted failure to "abide by" the conclusions in the Falcon FSAs.

Defendant also asserts that plaintiff breached the subject lease by "unilaterally fir[ing]" or "terminating" Falcon on April 17, 2015. (DE 14 at 22, 23). The subject lease, however, does not restrict plaintiff's ability to fire or terminate Falcon unilaterally. It suggests the opposite, by providing a mechanism for commissioning a "third party, acceptable to both parties." (DE 1-1 at 5). In any event, as noted above, section 8.08 does not impose upon plaintiff any other duties except

10

splitting "the fee for the third party" so commissioned. (Id.). Here, defendant does not allege that plaintiff failed to split a fee for services performed by Falcon.

In sum, defendant fails to allege any duty imposed by the subject lease breached by plaintiff. Therefore, defendant's counterclaim for breach of contract fails as a matter of law.

    2.    Declaratory Judgment

Defendant asserts a counterclaim under the Declaratory Judgment Act seeking a declaration that 1) plaintiff is in breach of the subject lease; 2) the contractually agreed upon process for determining whether defendant has returned the subject property to its environmental condition at the inception of the subject lease has been completed; 3) the Falcon ESAs determine that defendant has returned the subject property to its environmental condition at the inception of the subject lease; 4) defendant is not the successor to Rea Construction; 5) defendant is not responsible for any contamination caused by Rea Construction; and 6) defendant is not responsible for any contamination caused by NCDOT. (DE 14 at 23). Plaintiff argues that the claim should be dismissed because it is redundant of the breach of contract counterclaim and defendant's affirmative defenses.

Pursuant to the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." Id.

"[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter

11

jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995). "[A] district court must have good reason for declining to exercise its declaratory judgment jurisdiction." Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 594 (4th Cir. 2004) (internal quotations omitted). "[A] district court is obliged to rule on the merits of a declaratory judgment action when declaratory relief will serve a useful purpose in clarifying and settling the legal relations in issue, and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Id. (internal quotations omitted).

In some circumstances, courts have "declined to consider counterclaims for declaratory relief that are duplicative of affirmative defenses." See, e.g., Malibu Media, LLC v. Doe 1, No. CIV.A. DKC 12-1198, 2012 WL 6681990, at *3 (D. Md. Dec. 21, 2012) (collecting cases). Nevertheless, "[i]n evaluating whether a counterclaim is redundant, courts must consider if the defendant's interests are adequately protected without the counterclaim." Scottsdale Ins. Co. v. B & G Fitness Ctr., Inc., No. 4:14-CV-187-F, 2015 WL 4641530, at *2 (E.D.N.C. Aug. 4, 2015) (citing 6 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1406 (3d ed.2015)). "If there is any doubt about a counterclaim's redundancy, courts should exercise an abundance of caution by retaining the counterclaim." Id.

In this case, defendant's declaratory judgment counterclaim is redundant only in part. The first enumerated part of the counterclaim, seeking a declaration that plaintiff "is in breach of the [subject lease]," is redundant of defendant's first counterclaim. Where this court has determined that defendant fails to state a claim for breach of contract, this first enumerated part of the counterclaim for declaratory judgment claiming breach of contract also must be dismissed.

12

The remaining parts of the counterclaim are not exactly redundant of the affirmative defenses. While the remaining parts of the counterclaim introduce concepts that overlap in large part with concepts introduced in the affirmative defenses, there is not an exact match in the statements asserted in each. Given the difference in number of affirmative defenses and parts of the counterclaims, as well as differences in the statements used to assert the counterclaims and affirmative defenses, the court finds sufficient doubt about the counterclaim's redundancy to allow it to proceed in remaining part.

In sum, the part of the declaratory judgment counterclaim asserting breach of contract against plaintiff must be dismissed as redundant. The counterclaim is allowed to proceed in remaining part.

## CONCLUSION

Based on the foregoing, plaintiff's motion to dismiss is GRANTED IN PART and DENIED IN PART. Defendant's counterclaim for breach of contract is DISMISSED. The first enumerated part of defendant's counterclaim for declaratory judgment is DISMISSED. The remaining parts of defendant's counterclaim for declaratory judgment are allowed to proceed.

SO ORDERED, this the 17th day of June, 2016.

                                      LOUISE W. FLANAGAN
                                      United States District Judge